## LESTAPIES *v.* INGRAHAM, Assignee of the Estate of A. LAUSSAT.

Where one, by fraud, obtains compensation for injuries done to the property of another, who himself was unable to make a claim therefore, the receiver is accountable to the party whose property was injured.

In the year 1809, A., a citizen of the United States, shipped in his own name a quantity of sugar and coffee to St. Sebastian, in Spain, of which coffee one hundred and thirty bags belonged to B., a citizen of France, then in Philadelphia. The vessel and cargo were seized at St. Sebastian, and there confiscated, under the authority of the French government. A. having assigned his property for the benefit of his creditors, his assignee received indemnity for the spoliation, under the treaty of July 4, 1831, between the United States and France. Held, that B., although a citizen of France, might recover against A.'s assignee the amount received as indemnity for the coffee of which he was the owner.

*It seems,* that a citizen of the spoliating government, though domiciled in the United States, is not included in the benefits of the treaty; but supposing A. had connived at the application to the commissioners thereunder, by B. or his assignees, for indemnity for the confiscation of A.'s property, held in B.'s name, (of which connivance there was no evidence,) he is not debarred from receiving the amount awarded for the

loss on his goods, by reason of the fraud on the United States or the other claimants in preferring such a claim.

ERROR to the Court of Common Pleas of Philadelphia county.

*March* 10 *and* 11.—This was a feigned issue in the court below, directed to try the right of Adrian P. Lestapies to recover the amount of his interest or proportion of $23,454 92, awarded to Honore Fournier, the assignee of Anthony Laussat, by the commissioners under the treaty of July 4, 1831, between the United States of America and France, for said Laussat's claim for his interest in the brig Fox, Captain Cullen, which claim included one hundred and thirty bags of coffee, the property of said Lestapies, the value of which was included in the said award to the said assignee.

At the trial on the 25th of January, 1845, before PARSONS, J., the plaintiff gave in evidence proceedings in the Court of Common Pleas of Philadelphia county, by which Fournier was removed from the trust as assignee, on the 30th April, 1836, and the defendant in this issue appointed assignee of the estate of Anthony Laussat, and also the auditor's report upon his accounts, in which the claim made before the auditor on behalf of Adrian P. Lestapies, and the disposition made in regard to it, is stated as follows:—

"Before proceeding to notice the claims under the assignment, it is proper to advert to the claim of Mr. Lestapies for a portion of the funds in the hands of the assignee, which he alleges belongs specifically to him, and does not form any part of the assigned estate.

"The fund in the hands of the assignee consists of moneys received from the United States, as indemnity for French spoliations.

"Mr. Curcier, as attorney of Honore Fournier, the assignee for the creditors of Laussat, presented to the commissioners under the convention with France, memorial 1597, claiming indemnity for a shipment made by A. Laussat to St. Sebastian, on board the brig Fox, consisting of one hundred boxes white Havana sugar, thirty-two tierces and one hundred and ninety-four bags coffee, invoiced clear of charges at $14,577 26. In the invoice, Lestapies was interested to the value of one hundred and thirty bags of coffee, weighing fifteen thousand four hundred and forty-six pounds.

"The commissioners under the French treaty awarded on the whole invoice the sum of $23,454 92; Mr. Lestapies' interest in the invoice being $3,552 58; his proportion of the sum allowed would be $5,716 12.

"On the sum allowed, instalments amounting in the whole to $59\frac{344}{942}$ per cent. have been paid, making for Mr. Lestapies' proportion . . . . . . . . . $3,393 47
On which interest to 10th February, 1842, is . . 1,036 51

                                                        $4,429 98

"Mr. Lestapies now claims to recover this sum, as money specifically belonging to him, which never passed under the assignment for the creditors of Mr. Laussat, but remained impressed with a trust for Mr. Lestapies, and which he has a right to follow specifically.

"His right to this money was not admitted; but, on the contrary, was contested before the auditor, and an issue demanded to try the question.

"The auditor accordingly does not undertake to decide upon the merits of the claim, but leaves an amount in the hands of the assignee reasonably sufficient to cover the demand with interest and costs; without at present reporting the distribution thereof."

The plaintiff then called Joseph A. Clay, a witness, who testified as follows:—

"The original claim of Laussat's assignee for the brig Fox was $20,734 77; the amended claim before the commissioners was $23,746 75; the commissioners awarded the sum of $23,454 92. I was the agent of the assignee, and attended before them. The particulars of Mr. Laussat's claim were:

| | |
|---|--:|
| Cost of 100 boxes white Havana sugar, short price . . . | $4,433 14 |
| "      32 tierces coffee . . . . . . . . | 6,109 92 |
| "      194 bags do. . . . . . . . . . | 4,034 20 |
| | $14,577 26 |
| Charges, commission, &c. . . . . . . . . . | 455 45 |
| Correct by comparison with the original invoice . . . . | $15,023 71 |
| Premium of insurance at 25 per cent. and 2½ per cent. abatement as usual required to cover . . . . . . . . . . | 5,706 06 |
| | $20,734 77 |

The abatement of this claim, according to the market value at St. Sebastian, was:

| | |
|---|--:|
| 100 boxes white Havana sugar, net American weight . . . | lbs. 26,606 |
| Deduct 1½ per cent. . . . . . . . . . | 399 |
| Spanish weight . . . . . . . . . . | lbs. 26,207 |
| Spanish weight, 26,207 lbs., at 34 cts. . . . . . . | $8,910 38 |
| 32 tierces, 194 bags, } green coffee, net American weight, . . . . | lbs. 47,998 |
| Deduct 1⅓ per cent. . . . . . . . . . | 720 |
| Spanish weight . . . . . . . . . . | lbs. 47,278 |

| | |
|---|---|
| At 42½ cents . . . . . . . . . . | $20,093 15 |
| Add sugar . . . . . . . . . . | 8,910 38 |
| | $29,003 53 |
| Deduct freight as per freight list . . . . . . . | 2,618 26 |
| | $26,385 27 |
| Deduct 10 per cent. to cover duties and charges . . . . | 2,638 52 |
| | $23,746 75 |

The plaintiff also produced, and gave in evidence, an invoice signed by Anthony Laussat, dated 10th October, 1809, in the words and figures following, to wit:

Invoice of one hundred and thirty bags of coffee shipped by A. Laussat, on account and risk of Mr. J. G. de Villanueva, on board the brig Fox, Capt. Thomas Cullen, bound to St. Sebastian, and addressed for sale and return to Mr. John Ribaut, supercargo on board, viz.:

P
L ⎰ 130 bags coffee weighing 15,546 lbs. net, at 17½ . . . . $2,720 55

*Charges.*

| | | |
|---|---|---|
| Permit . . . . . . . . . | $0 70 | |
| Porterage, 12 loads at 33 cts. . . . . . | 3 96 | |
| Certificate of property at the custom-house . . . | 20 | |
| Do.     at the consul's . . . . . . | 2 00 | 6 86 |
| | | $2,727 41 |

*Philadelphia*, 10th October, 1809.

A. LAUSSAT.

And also the acknowledgment of Anthony Laussat, dated 14th October, 1809, signed by him, in the following words, to wit:—

"I do hereby certify to have shipped the goods mentioned in the annexed invoice, amounting to thirteen thousand two hundred sixty-seven dollars forty-eight cents, on account and risk of Mr. J. G. de Villanueva on board the brig Squirrel, Captain Jacob Wing, bound to St. Sebastian, and consigned for sale and return to Mr. John Bonnett, supercargo on board of said brig, and that he owns jointly with me, one-third of said brig Squirrel, the other two-thirds being owned by Mr. Abram Peash, and Mr. J. W. Foussatt.

"I also acknowledge that I have shipped on account of said Mr. J. G. Villanueva, one hundred and thirty bags of coffee, amounting as per the annexed invoice, to two thousand seven hundred and twenty-seven dollars and forty-one cents, on board the brig Fox, Captain Thomas Cullen, bound to St. Sebastian, and consigned for sale and return to Mr. John Ribaut, supercargo on board.

"Of the whole of which I will render him an account, and pay him, or his order, the net proceeds as soon as I will be in cash for the same.

"It being understood that by consent of Mr. J. G. de Villaneuva,

I have instructed the two above-mentioned supercargoes to remit me, by the return of said vessels, the amount of the outward invoices in such goods as they will think best for this market, and the profits to bring them to me in good bills of exchange on London, provided they can purchase them fifteen per cent. below par; otherwise to deposit the amount of said profits in the hands of Mr. Justine Foussatt, merchant at Bourdeaux, subject to my orders in the same manner as I have ordered them to do with my adventure on board the same vessel. In witness whereof I have signed this. Philadelphia, the 14th October, 1809.

"A. LAUSSAT."

On which was endorsed, in the handwriting of Lestapies, " 14 Octobre, 1809, Reconnoissances de A. Laussat relatives à mon interet dans les bricks Squirrel et Fox."

The plaintiff also read in evidence the testimony of Andrew Curcier, now deceased, given in the case of Lestapies, (the above-named plaintiff,) and Levis, formerly assignee of A. Laussat's estate, in the District Court for the city and county of Philadelphia, in the following words, to wit :

" I knew Mr. Lestapies and Mr. Villanueva ; they were the same person ; the endorsement, (the paper of 14th October, 1809, signed A. Laussat, shown to the witness,) is in Mr. Lestapies' handwriting ; in the year 1802 or 1803, the Spanish government used to supply the French government with a great deal of money ; he was the confidential clerk of Hope & Co., and was sent to Vera Cruz to receive the money from the Spanish government ; there was a Spanish law that would not allow a foreigner to go to those countries to settle ; he was obliged to take a Spanish name ; he took that of Villanueva ; he spoke the language like a Spaniard ; he was from Bearn, on the Pyrenees. I knew all about the interest of Villanueva, in the Squirrel and Fox ; Lestapies took his interest back from the Squirrel when she returned ; it was talked of at the time between them. I had conversation with Levis ; he said he had received the money, and would not let it go out again. My impression is that he, Lestapies, was naturalized ; I believe he was naturalized here."

The plaintiff also produced Peter Bousquet, a witness, who being sworn, testified as follows :—" I knew Mr. Peter Lestapies, and well, by the name of Villanueva, as agent of the house of Hope & Co., when he went to Vera Cruz to receive a large sum of money. He and Mr. Parish were agents of Hope & Co. He was here in 1808 and 1809 ; I do not know his handwriting."

The above-stated testimony and evidence having been given, and the plaintiffs having admitted that said plaintiff was not, in 1809, or at any time since, an American citizen, but a native of Bearn in France, and the defendant having given no testimony or evidence, prayed the court to instruct the jury :

1. That the claim for the proceeds of the said one hundred and thirty bags of coffee, belonging to the said plaintiff, and the amount of indemnity awarded for the same by the commissioners, under the treaty with France of 4th July, 1831, did not pass under the assignment of Anthony Laussat, of 8th June, 1819, but remained the property of said Lestapies, and that he was entitled to recover from the assignee of said Laussat's estate, such proportion of the amount received, as indemnity for said Laussat's claim for the Fox's cargo, as would have been awarded to him, said Lestapies, by the commissioners upon a claim by himself for indemnity for the said one hundred and thirty bags of coffee.

2. That there is nothing in the provisions of the treaty or convention between the United States and France of the 4th July, 1831, or in those of the act of Congress, to carry the same into effect, passed July 13th, 1832, to prevent a recovery by the plaintiff in this action; which instruction so prayed for, the court refused to give, and charged the jury as follows :

"All the facts in this case are admitted, and the questions raised for our decision are questions of law which necessarily arise from the facts thus conceded in the cause.

"The fund of money for distribution was awarded to the assignee of Anthony Laussat, for the loss of the brig Fox, in pursuance of a treaty between this government and France, of the 4th of July, 1831.

"It is manifest that Laussat was not the owner of all the property on board the ship, and particularly the one hundred and thirty bags of coffee, and if there was nothing in the case but the facts briefly stated in the plaintiff's first point, I should be disposed to instruct the jury that the plaintiff was entitled to recover.  But it is admitted by the counsel for the plaintiff, that when the property was shipped the plaintiff was a citizen of France, and not an American citizen, nor is there any evidence that he ever was a citizen of the United States ; hence it is contended by the counsel for the defendant that he is not entitled to recover—upon the ground that the treaty with France, by our government, ratified in 1831, embraced only American citizens, and that France, by that treaty, never stipulated to give money for the loss of property suffered by the subjects of her own government.

" The question is one of considerable importance, and I am satisfied the counsel on both sides desire it settled by the court of last resort. I shall therefore give that opinion on the law which appears to me to be the correct one, and raise the question broadly for the ultimate determination of the Supreme Court.

" Hence the court instruct you, that should the jury believe the whole evidence in the case, the plaintiff is not entitled to recover, upon the grounds that the indemnity given by the treaty for the loss of property by American citizens, does not embrace the citizens of France for any loss they may have sustained. The plaintiff being a citizen of France when his property was lost, is not entitled to the benefits of that treaty nor to the funds now in the hands of the assignee for distribution. We therefore say, that under the law, the defendant is entitled to your verdict."

The counsel for the plaintiff excepted to the charge of the court, and requested that the same may be reduced to writing and filed of record, which was done.

The plaintiff in error assigns,

1. General errors; and also,

2. The following specific error: Because the court instructed the jury, that should the jury believe the whole evidence in the cause, the plaintiff is not entitled to recover, upon the ground that the indemnity given by the treaty of 4th July, 1831, between the United States and France, for the loss of property by American citizens, does not embrace the citizens of France for any loss they may have sustained. The plaintiff being a citizen of France when his property was lost, is not entitled to the benefit of that treaty, nor to the fund now in the hands of the assignee for distribution.

*Ingraham*, for the plaintiff in error.—Lestapies was a *citizen*, within the meaning of the convention with France of July 4, 1836. The words of the first article are: " Le gouvernement Français à l'effet de se libérer complétement de toutes les réclamations élevées contre lui par des *citoyens* des Etats-Unis pour saisies," &c. Pamph. Laws U. S. 1832, appendix, p. 34. A treaty, after its ratification, is a general public law, and as such receives the interpretation of the courts. The true meaning is drawn from the words, parties, circumstances, object, and whole subject-matter. It is matter of notoriety, that numbers of Dutch, Germans, Spaniards, Italians, and Frenchmen, inhabited this country, before and after 1810— some of whom died here, after many years' residence, during which they carried on extensive commercial operations, of great advan-

tage to the republic, without actual naturalization, though some had declared their "intentions." The rights of such persons would be protected, and their losses indemnified, under this treaty, the object of which was to take care of our *commerce*, without regard to the birth of those who carried it on, provided they were *domiciled*, or, in the words of the treaty, "citizens" of the United States by residence. Nor does any expression occur in the English or French version of the treaty to show that any other meaning was attached by its framers to the word "citizen" than that of "domiciled inhabitant." The common idea that the *privilege of voting*, which is political purely, makes the citizen, has led to the error in this case; for no decision has taken *naturalization* as its ground. *Domicil*, and in many instances *domicil for commerce*, is the leading principle; The Ann Green, 1 Gall. Rep. 274, 467; Murray *v.* The Betsey, 2 Cranch, 64; 2 Dall. Rep. 41, 42; Livingston *v.* Gilchrist, 7 Cranch, 507; The Venus, 8 Cranch, 253; The Mary and Susan, 1 Wheat. Rep. 46—a very remarkable case; The Pizarro, 2 Wheat. 227, 245; The Freindschaft, 3 Wheat. Rep. 14; Carneale *v.* Bates, 10 Wheat. Rep. 181; 1 Marten's Rec. des princ. Traités, 690, edit. Gottingen, 1791; Beebe *v.* Johnson, 19 Wend. Rep. 500; Wilson *v.* Marryat, 1 Bos. & Pul. 430; Hollingsworth *v.* Duane, Wallace's Rep. 51; Cooper *v.* Galbraith, 3 Wash. C. C. Rep. 546; Chase *v.* Clark, 5 Mass. Rep. 70; Reilly *v.* Lamar, 2 Cranch, 343. A Cherokee Indian, or a negro, who has no right to vote, (Hobbs *v.* Fogg, 6 Watts, 553,) but has the right to carry on trade, would have been entitled to indemnity under this treaty.

The case, however, does not require the aid of this doctrine; for the right to recover is perfect without it. The transaction itself, in 1809, was perfectly innocent. The voyage to Spain was legal; and the question is precisely what it would have been between Laussat, if alive and solvent, and Lestapies, calling for an account. The assignment makes no difference; Williams *v.* Twelves, 3 Whart. Rep. 485, 4 Whart. Rep. 500. His property has gone to increase this fund; and Laussat and those claiming under him could not set up that it was illegal, which it was not, in bar of an account; Tenant *v.* Elliott, Farmer *v.* Russell, 1 Bos. & Pul. 3, 296; Watts *v.* Brooke, 3 Ves. Jun. 611; Austin *v.* Winston, Wise *v.* Craig, 1 Hen. & Munf. 33, 578; Bettely *v.* Reed, 4 Adol. & Ell. N. S. 511; Faikney *v.* Reynous, 4 Burr. 2069; Petrie *v.* Hannay, 3 Term Rep. 419; Ex parte Bulmer, 13 Ves. Jun. 316; Booth *v.* Hodgson, 6 Term Rep. 405. The cases of Anderson *v.* Moncrieff, 3 Desaus.

Chan. Rep. 124, and Berkshire v. Evans, 4 Leigh's Rep. 223, are strongly in point.

*J. M. Read*, for defendant in error.—There was, in fact, but one question in the court below, which has branched into two here; but the plaintiff in error has no case, if the question decided below is against him. Since the United States became a nation, in 1776, they have made many treaties with different powers. They were nearly involved in a war with France, in support of the rights of their citizens; and they are at war with Mexico for the same purpose. But it will hardly be contended that they ever meant to go to war to support the claims of an alien arising out of the act of his own government. The word "citizen" has always been used in one sense since the treaty with France of 1778, and is found in that of 1788, of 1803, for the cession of Louisiana, and the various treaties with Spain, and Denmark, and Mexico, with the same meaning. It has always been understood to mean those whose political rights here were perfect. The messages of President Jackson, during his administration, and the executive documents always used the word in that sense; 1 Laws U. S. (Rush's ed.) 262; Pamph. Laws, 1819, 64; Ib. 1831, 31; Ib. 1840, 11; Pres. Mess., Dec. 2, 1834; Ib. Jan. 15, 1836. It is true that mere birth in all cases does not constitute citizenship, as in Duane's case, (Wall. Rep. 51;) but Duane was born a British subject, and removed during a civil war to the jurisdiction of Britain, before the Declaration of Independence, and was strictly an alien. Judge Cooper was a naturalized citizen, or he would have sued as an alien. The cases cited on the other side are cases of prize and war—peculiar questions,—and settle, that persons may become "citizens" by domicil of other countries for *war*, but not for *redress* and *indemnity*. Besides, the award of the commissioners is conclusive; Comegys v. Vasse, 1 Peters, 193; 5 Peters, 710; Lee v. Thorndyke, 2 Metc.; 7 Paige, 750; Cramond v. Yard, 5 Rawle, 18; Aycinena v. Peries, 6 Watts & Serg. 243.

Can the assignee and creditors of Laussat set up this defence? They certainly may, because, first, the transaction was unrighteous, and, second, if there be any *delictum*, the defendant is in the better condition: that is the general principle of law. The plaintiff would make out his claim through a fraud upon this treaty. Montefiore v. Montefiore, 1 W. Black. Rep. 363, is on all fours with this case. 1 Story's Equity, 298, 316, (last ed.,) where the cases between parties to agreements against public policy are collected.

De Melton *v.* De Mello, 2 Campb. 420; 12 East. 234; 4 Hill, 424. (*a*)

*March* 22. GIBSON, C. J.—It appears, that in the year 1809, Mr. Laussat, a citizen of the United States, shipped, in his own name, for the port of St. Sebastian, certain sugars and bags of coffee, a part of which belonged to the plaintiff, a citizen of France; and that the property was seized and confiscated at that place by the authority of the French government. This action is brought to recover the plaintiff's share of the compensation received for the spoliation, under the treaty of 1831, by the defendant's predecessor in the trust created by Mr. Laussat for the benefit of his creditors. The treaty gave the right of reclamation to citizens of the United States; and we would find it a question not free from difficulty, were we bound to decide it, whether a foreign merchant, domiciliated here for purposes of trade, is such a citizen. It is well settled, that a subject or citizen of one country may become a subject or citizen of another, by a change of his domicil, in time of peace, and acquire the commercial character and rights of a native. But is the title to extra-territorial protection a commercial or a political right? He is doubtless entitled to the *civil* right of protection within the country of his domicil; but there is no dictum of a judge or a text-writer for the position that the government is bound to follow and watch over his property, whithersoever he may choose to send it. It may be legitimately captured in time of war, even by the cruisers of his own nation, because it adds to the wealth of its enemy; and hence an argument, that as it is exposed to the perils incident to its national character, it is entitled to the correlative right of protection. But that conclusion seems not to follow where, as was the case here, the act of aggression has been done by the government to which the owner of the property owed his political allegiance; for a government would scarce be bound to retaliate for the execution of a captured deserter to its ranks, though it had lawfully enlisted him. It might, perhaps, be bound to protect the merchandise of a resident from an aggression, on the high seas, of a third power; but it would assume a doubtful position, did it place itself between him and his legitimate sovereign. Now, at the time of this shipment, the plaintiff was, and

---

(*a*) The question whether a writ of error was proper in this case was withdrawn by Mr. Read, as the parties were desirous of having the opinion of the court on the point raised, without further delay. On this point see Ingraham *v.* Caricabura, *post.*

perhaps still is, a citizen of France, by whose authority the property was seized; and it will scarce be thought the United States would have been bound to declare war in order to compel France to release it. If that be so, it settles the question; for a government is not at liberty to demand any thing for its subjects which it is not bound, to the extent of its power, to enforce. Like any other instrument, the treaty is to be interpreted according to the actual intent of the parties to it; and we can scarce suppose that a government would stoop to the indignity of redressing a wrong to one of its own citizens at the demand of a foreign power, or that the government of the United States felt itself bound to make such a demand. But, as a decision of the point is not at present indispensable, these suggestions are thrown out as first impressions, destitute of all pretence to judicial authority.

But take it, for the sake of the argument, that the plaintiff was not entitled to compensation for his part of the invoice by the treaty; yet the assignee of Mr. Laussat, who had shipped the property in his own name, received compensation for it; and why should the creditors or their trustee be allowed to retain it? The award of the commissioners is conclusive that it was properly allowed to some one; and though it may not be conclusive between the present parties, the creditors of Mr. Laussat would have the benefit of an entire fund, to a part of which they have no other title than the wrongful receipt of it by his assignee. The objection to a recovery is, not that the plaintiff assisted in committing a fraud on the French government or the British cruisers, in covering the property as neutral, but that he committed a fraud on the American claimants by throwing himself on their fund and reducing the rate of their compensation. He certainly does not appear to have been a party to the proceeding, at least in the first instance; for the application was made by the assignee of Mr. Laussat, as the owner of the invoice, and there is no evidence that it was made with the plaintiff's privity and approbation. If he took no part in it, there is no illegality in his way to preclude him from following the gratuitous compensation of his loss into the hands of one who had received it for his use. But suppose he connived at the application to the commissioners, yet the transaction would not be so corrupt that no valid contract would grow out of it. True it is, that an illegal contract will not be executed; but when it has been executed by the parties themselves, and the illegal object of it has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties, for a pro-

mise, express or implied; and the court will not unravel the transaction to discover its origin.   In Ex parte Bulmer, 13 Ves. 316, Lord Erskine denied that if a plaintiff cannot open his case without showing that he had broken the law, the court will not assist him, whatever the justice of his claim may be; or that his case may be so intimately connected with illegal transactions as to be inseparable from them; and he said that if the illegality be only *malum prohibitum*, (a distinction that has since been abolished,) the plaintiff may recover, *unless the action be expressly on the contract precluded*.   Faikney v. Reynous, 4 Burr. 2069, on which he relied, though doubted by high authority, was justly said by him to have stood its ground.   The action in that case was on a bond given by a partner to his co-partner for differences paid in a stock-jobbing transaction prohibited by act of parliament; and the plaintiff was allowed to recover because the bond was evidence, not of legal consideration, but of the defendant's assent to the voluntary payment of a debt which could not have been recovered from the firm.   In what does that case differ from this ?   Merely in the circumstance that a subsequent security was given, but which was allowed to show no more than that the defendant had become a party to a payment which could not have been enforced against him.   The solemnity of the security would not have precluded an inquiry into the consideration of it, had it been illegal; for as to that, a specialty stands in equity on a level with a parol contract at law.   In the case before us, the assumpsit is implied from the receipt of the money, and if the consideration of it will not support a promise, it would not support a bond.   Faikney v. Reynous, therefore, is in point; and it is sustained by Petrie v. Hannay, 3 Term Rep. 419, the circumstances of which were the same, except that the partner plaintiff had paid the differences by a bill on which there was a recovery against him; and his action against his co-partner was held to be maintainable by all the judges except Lord Kenyon, who vainly attempted to distinguish the case from Faikney v. Reynous, for the alleged conclusiveness of the bond at law; for it was shown by his brethren that the stock-jobbing act had been pleaded.   In the last case, too, it is to be noticed that the action was, as here, on an implied assumpsit, and not on a subsequent security.   Notwithstanding, therefore, that the plaintiff may have assented to the application to the commissioners, these cases have established a principle which entitles him to recover.

Judgment reversed, and *venire facias de novo* awarded.