CITY OF SANTA CRUZ v. WYKES et al.

(Circuit Court of Appeals, Ninth Circuit. January 13, 1913.)

No. 2,088

1. Municipal Corporations (§ 863*)—Indebtedness—Limitation—Mode of Creation.

Const. Cal. art. 11, § 18, provides that no city shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the revenue provided for such year without the assent of two-thirds of the qualified electors voting at an election held for that purpose, nor unless, before or after that time, provision is made for the collection of an annual tax sufficient to pay interest on the indebtedness as it falls due, and also to constitute a sinking fund to pay the principal within 20 years from the time of contracting the same, and any indebtedness or liability incurred contrary to the provisions shall be void. Held, that such provision was an inhibition against which a municipality could not incur any indebtedness exceeding in any year the revenue produced for such year except in the mode or manner prescribed, which mode became the measure of the power of the municipality to incur an indebtedness beyond the measure fixed by the fundamental law.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1824–1827; Dec. Dig. § 863.*]

2. Municipal Corporations (§ 867*)—Excess Indebtedness—Power to Create.

Under Const. Cal. art. 11, § 18, prohibiting the creation of increased indebtedness by a municipal corporation except by the assent of two-thirds of the qualified voters voting at an election, the power to increase the excess indebtedness does not abide with the municipality, nor with its common council alone, but with the assent of two-thirds of the electors.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1841; Dec. Dig. § 867.*]

3. Municipal Corporations (§ 864*)—Purchase of Property Subject to Mortgage—Assumption of Mortgage—Municipal Indebtedness.

Where a municipal corporation, desiring to construct waterworks was unable to do so because a required bond issue would exceed the city's debt limit, authorized a private corporation to construct the works, and agreed to purchase the same from such corporation after they were completed, and accepted a deed from the corporation by which it assumed payment of bonds issued by the corporation and secured by mortgage on the works, such assumption made the bonds a municipal debt,

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

though it was expected to pay the principal and interest out of the income of the property.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1828–1835; Dec. Dig. § 864.*]

4. MUNICIPAL CORPORATIONS (§ 943*)—MUNICIPAL BONDS—RECITALS—BONA FIDE PURCHASER.

Recitals in municipal bonds that they have been issued in pursuance of and in conformity with statutes and ordinances authorizing their issue estopped the city to deny that they were so issued.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1972–1977; Dec. Dig. § 943.*]

5. MUNICIPAL CORPORATIONS (§ 941*)—BONDS—RECITALS—BONA FIDE PURCHASER.

Where bonds executed by a private corporation operating a city waterworks were assumed by the company as a part of the purchase price of the works, and contained no recital or certificate by municipal or other officers that they were issued in conformity with either the Constitution or laws of the state, or with any ordinance of the city authorizing such issue, the holders of the bonds as against the city were not bona fide purchasers for value, but were charged with notice of any infirmity in the bonds or of want of power in the city to authorize their issue or secure the same by mortgage on its property.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1961–1966; Dec. Dig. § 941.*]

6. CORPORATIONS (§ 487*)—ULTRA VIRES ACT—EXECUTED TRANSACTION.

The principle that a corporation will not be permitted to plead ultra vires as a defense to an executed transaction applies where the contract is completely performed on both sides, in which case the court will not interpose to restore either party to his former state or grant other relief, but relief will be granted if it can be done independently of the contract or a new, further, or independent consideration subsists in support of the transaction sought to be enforced.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1893–1898; Dec. Dig. § 487.*]

7. MUNICIPAL CORPORATIONS (§ 878*)—CONTRACTS—ULTRA VIRES—ACTS IN QUASI PRIVATE RELATION.

Where defendant city at the time it contracted for the construction of waterworks under an agreement to purchase the same after they were completed in so doing acted in a proprietary or quasi private relation, and not in its governmental capacity, the fact that it was not then authorized to incur indebtedness to the amount necessary to construct the purchase of works did not render the contract ultra vires in its primary sense, so that, if the city subsequently had power to incur the indebtedness attending the construction and requirements of the works, it had power to assume the obligations of the seller secured by a mortgage on the works as a part of the price.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1857–1861; Dec. Dig. § 878.*]

8. MORTGAGES (§ 283*)—ASSUMPTION BY PURCHASER OF MORTGAGED PROPERTY—PRIMARY DEBTOR—VALIDITY OF MORTGAGE—ESTOPPEL TO DENY.

One purchasing property subject to a mortgage, and agreeing to pay the mortgage debt, becomes primarily liable to the holders of the obligations so assumed, and will not be heard to question the validity thereof.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 756–758; Dec. Dig. § 283.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. MUNICIPAL CORPORATIONS (§ 878*)—INDEBTEDNESS—BONDS—RATIFICATION
   —REFUNDING.

   Const. Cal. art. 11, § 18, prohibits cities from incurring indebtedness exceeding in excess the revenue of any year without the assent of two-thirds of the qualified voters voting at an election, etc. By Act March 19, 1889 (St. Cal. 1889, p. 399), it was provided that a two-thirds vote should be required, and the debt limit fixed at 5 per cent. of the assessed value of the city's real and personal property. By Act March 11, 1891 (St. Cal. 1891, p. 84), the limit was raised from 5 to 15 per cent. *Held*, that where a city having assumed certain water bonds as a part of the purchase price of the works which at the time of the assumption exceeded the city's debt limit, but after the city acquired authority to incur the indebtedness by raising the limit to 15 per cent., it passed an ordinance submitting the question of whether such bonds and other city indebtedness should be refunded to the voters, and authority to refund was granted by an almost unanimous majority, such vote operated as a ratification of the indebtedness and validated the bonds.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1857–1861; Dec. Dig. § 878.*

   Constitutional and statutory limitations of municipal indebtedness, see note to City of Helena v. Mills, 36 C. C. A. 6.]

Appeal from the Circuit Court of the United States for the Northern District of California; Wm. C. Van Fleet, Judge.

Bill in equity by George Wykes, as successor to the Holland Trust Company of New York, as trustee against the City Water Company of Santa Cruz and the City of Santa Cruz to foreclose a mortgage given by the water company to secure bonds issued by it. Judgment (184 Fed. 752) for complainant, and defendant city appeals. Affirmed.

See, also, 190 Fed. 1017.

Up to July 2, 1888, the city of Santa Cruz was served with water for municipal and household purposes by private enterprise, but on that date the common council of the city passed an ordinance declaring that public necessity required the construction and acquisition of a system of waterworks by the city. On September 6th a bonded indebtedness was authorized by the electorate of the city to the extent of $300,000, the bonds to bear interest at the rate of 5 per cent. The vote upon the proposition was nearly unanimous. The city entered at once upon the acquisition of water rights and a reservoir site, and of the authorized bond issue expended $30,000.

On March 19, 1889, the Legislature of the state of California adopted an act limiting the bonding power of municipalities to 5 per cent. of the assessed value of the property within their limits. Prior to the adoption of this act there was no limitation of the power of cities to incur indebtedness. The assessed valuation of the property within the city of Santa Cruz for that year was $3,245,060, and its borrowing capacity therefore $162,253. This sum fell largely below the estimated expenditures for providing the water system contemplated. Effort was made to dispose of the balance of the city bond issue, namely, the $270,000 thereof, but without avail. Having thus failed in the project of itself constructing a waterworks system, the city on September 16, 1889, entered into a contract with Coffin & Stanton, a firm composed of William Edward Coffin, Walter Stanton, Charles Hervey Jackson, and Charles F. Street, to construct and equip a waterworks system, which recites that: "Whereas, the city of Santa Cruz desires to acquire a waterworks system for said city, and whereas, Coffin & Stanton desire to furnish such a waterworks system: Now, therefore, for and in consideration of the sum of one dollar, paid in hand this 16th day of September, 1889, to said city of Santa Cruz by said Coffin & Stanton, the receipt of which is hereby duly acknowledged, and other valuable considerations, the following contract has been entered into."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In purport the city agrees to grant to Coffin & Stanton a franchise for the construction of the waterworks, and Coffin & Stanton agree to construct or cause the same to be constructed in conformity with certain specifications prepared by the city's engineer. The city agrees to purchase the waterworks when completed, and to pay therefor the sum of $320,000 in manner specified. Coffin & Stanton being accorded the privilege of assigning the contract and all rights granted by the city to whomsoever they might elect. Coffin & Stanton agree to organize, or cause to be organized, a corporation under the name "City Water Company of Santa Cruz," to which the franchise shall be assigned. The Water Company is to cause to be issued a first mortgage on all properties, rights, titles, and franchises owned or to be acquired for an amount not to exceed $400,000, the bonds to bear interest at a rate not to exceed 6 per cent., and to mature in not more than 30 years, and to issue to Coffin & Stanton at various times during the progress of the work such number of first-mortgage bonds as shall be required for construction purposes, Coffin & Stanton making all necessary cash advances, but not in excess of $320,000, except in the event of changes or additions to the waterworks system, when the Water Company may issue a sufficient number of first-mortgage bonds at 90 cents on the dollar to pay for such changes or additions, and also issue, at a price not below 90 cents on the dollar, a sufficient number of such bonds to pay the interest on any of its outstanding bonds, except such outstanding bonds as are held in escrow as later provided for. When Coffin & Stanton shall have received all of said $320,000 of bonds, and when the Water Company shall have completed the waterworks, then Coffin & Stanton are to deposit with the American Loan & Trust Company of New York, or such other trust company as may be agreed upon, $270,000 of such bonds, which shall be held in trust by such trust company to secure a like amount, namely, $270,000, of 5 per cent. bonds of the city, which said bonds it is recited the city has "heretofore sold to said Coffin & Stanton," the deed of trust or escrow to provide that, when any of the annual installments of said 5 per cent. bonds shall be paid by the city, the trust company shall cancel a similar amount of first-mortgage bonds, and so continue until all of said Water Company bonds deposited with it are canceled. On default in payment of principal or any installment of interest of the city 5 per cent. bonds, and a continuance of such default for a period of six months on the part of the city, the trust company shall be authorized to deliver said water bonds to the holders of the 5 per cent. city bonds, and provisions to that effect are stipulated to be contained in the deed of trust or escrow. The Water Company, when the waterworks shall have been fully completed, is to convey to the city all its property, rights, titles, and franchises to have and to hold forever, subject only to the mortgage and deed of trust or escrow before mentioned.

The city further agrees to set aside from the gross revenues derived from the waterworks an amount sufficient to pay the interest on said first-mortgage bonds outstanding, except those in escrow, and after five years an amount sufficient to form a sinking fund for the redemption of said outstanding bonds at maturity, except those so held in escrow. The Water Company is to commence construction as soon as practicable, and to have the waterworks completed within one year thereafter, provided that neither the Water Company nor Coffin & Stanton shall be held responsible for unavoidable delays, and provided, further, that the city shall convey to the Water Company clear and unincumbered rights to at least three-quarters of the riparian rights to Laguna creek, the proposed source of supply for said waterworks, or at least three-quarters of such water, also a clear right of way throughout the entire system for laying all necessary pipes or mains, and a clear title to all lands necessary for reservoir sites, or to such other lands as may be found necessary for the effective operation of said waterworks, all of which said transfers of rights or water rights and reservoir sites are to be subject to the legal and equitable rights of the city to the performance of the contract. The Water Company is not to be called upon to begin work until such properties shall have been conveyed to it and the title examined and approved by its counsel. Coffin & Stanton guarantee the performance of all the acts of the

Water Company specified to be performed by it, and agree to pay $50,000 as liquidated damages in case of failure to perform.

On September 23, 1889, the parties entered into a further agreement, which, after reciting, "Whereas, Coffin & Stanton have purchased two hundred and seventy thousand dollars five per cent. bonds of the city of Santa Cruz, and have entered into an agreement under date of the sixteenth day of September, 1889, with the city of Santa Cruz, for the sale to said city of certain water-works, named therein, and whereas, it is desired that the proceeds of the sale of said bonds shall be used solely for the purpose of said works or the redemption of said bonds," provides, in effect, that the city shall deposit with Coffin & Stanton the sum of $245,000 of the proceeds of the sale of said bonds, to be placed to the credit of the city on the books of Coffin & Stanton, for the use of the City Water Company, which fund Coffin & Stanton agree to use in carrying out the contract aforementioned; in the event of the failure of the city to acquire the waterworks in accordance with said contract the fund to be applied by Coffin & Stanton to the retirement and redemption of the $270,000 5 per cent. city bonds, and for the repayment to the city of any payments it may have made on said bonds, or said Coffin & Stanton to be personally liable for the full amount. Liquidated damages for nonperformance are provided for in the sum of $300,000. And it is further agreed that when the contracts are awarded for construction, if awarded by the Water Company, Coffin & Stanton shall take security from the contractors in the amount of $150,000 as additional security for the fulfillment of this agreement and the contracts referred to.

These agreements were signed by G. Bowman, mayor of the city, and attested by O. J. Lincoln, city clerk. No ordinance is shown authorizing their execution. The City Water Company was incorporated September 30, 1889, as contemplated by the agreement. Prior to November 20, 1889, the city acquired certain lands, rights of way, and water rights, including the right to the use of the waters of Laguna creek, together with a reservoir site for the storage of such water, a large part of which was purchased with the proceeds of the bonds issued by the city. All these lands, water rights, privileges, easements, reservoir site, and other property so acquired were on that date conveyed by deed of the city executed through G. Bowman, its mayor, to the City Water Company. This deed was authorized by Ordinance No. 192, adopted on the same day. By the terms of the deed the grant was upon the express condition that the agreement made with the city on the part of Coffin & Stanton, under the contracts of September 16 and 23, 1889, should be strictly performed by the Water Company as well as by Coffin & Stanton. In the meantime the city had granted to Coffin & Stanton, by Ordinance No. 188, a franchise for constructing the water system and supplying the city with water, together with the right to lay mains in the streets, and to do all things necessary for constructing and maintaining such system, although it appears that Coffin & Stanton did not assign the franchise and privileges appertaining thereto to the Water Company until in June, 1890. On April 21, 1890, the Water Company authorized the issuance of bonds in the aggregate of $400,000 to bear date May 1, 1890, payable to the Holland Trust Company, and subsequently, on May 1, 1890, executed to the Holland Trust Company a mortgage upon its property and franchises, including the waterworks system to be constructed, to secure the payment of such bonds in accordance with their provisions. On June 2, 1890, the Holland Trust Company was by ordinance of the city designated as the depositary of the bonds of the Water Company. Two hundred and seventy thousand dollars of the water bonds were deposited with the Holland Trust Company to secure a like amount of city bonds theretofore transferred to Coffin & Stanton in pursuance of the terms of the agreement of September 16, 1889. Coffin & Stanton constructed the system by subcontract with the Risdon Iron & Locomotive Works, in all respects to the satisfaction of the city engineer, and on November 24, 1890, the report of the engineer was received by the common council of the city, and, the property having been tendered to the city by the contractors, the city attorney was authorized to examine the titles, deeds of conveyance, etc., and, if regular, to place the same of record.

On March 29, 1892, the City Water Company executed to the city a deed reconveying the waterworks system and property. The deed recites, among other things, that "the said system of waterworks has been fully completed to the satisfaction of the party of the second part, and said waterworks have been accepted by it." And its habendum clause is as follows: "To have and to hold the same and every part thereof unto the said party of the second part, its successors and assigns, subject, however, to said mortgage or deed of trust and all the obligations thereby imposed, which bonds, mortgage, or deed of trust, and obligations, the party of the second part agrees to pay and perform." On May 2d this deed, as to the matter of its acceptance, was referred to the new common council of the city, and at a meeting held May 23d was referred to the water committee. On March 5, 1894, nearly two years later, on motion it was ordered by the common council that the deed be formally accepted and recorded. The order was not approved by the mayor, however, until April 2, 1894. The entire $400,000 bond issue of the City Water Company was delivered to the Holland Trust Company June 3, 1890. Thereafter, on June 14, 1890, $50,000 of these bonds were delivered by the Trust Company to Coffin & Stanton, $10,000 on July 7th, and $70,000 on July 15th, aggregating $130,000. Later Coffin & Stanton returned $27,000 of these latter bonds to the Trust Company, and still later Coffin & Stanton agreed to surrender others of these bonds, reducing the entire amount outstanding to $89,000.

On March 11, 1891, the Legislature passed another act, by which the limitation of indebtedness which municipalities were permitted to incur for acquiring public improvements was increased to 15 per cent. of the assessed valuation of the taxable property. On February 26, 1894, the city council adopted an ordinance calling a special election in the city for the purpose of submitting to the qualified electors the question whether the bonded indebtedness of the city should be refunded, among which indebtedness were specified 89 first-mortgage bonds of the City Water Company, of date May 1, 1890, being bonds of the $400,000 issue of said Water Company and accrued interest thereon. The election contemplated was held March 13, 1894, resulting in a vote of 538 in favor of and 57 against the proposition of refunding the city's bonded indebtedness; the result of the election being declared by the common council March 15th. A contract was shortly thereafter entered into with Coffin & Stanton for refunding said indebtedness. This suit was instituted against the city October 10, 1898, to recover upon 103 of the water bonds, and for a foreclosure of the mortgage given by the Water Company to secure the payment of the same. Decree was rendered favorable to complainant May 24, 1911, George Wykes being substituted in the meanwhile for the Holland Trust Company of New York. From this decree the city of Santa Cruz appeals.

Curtis H. Lindley and Henry Eickhoff, both of San Francisco, Cal., for appellant.

Edward Mills Adams, of San Francisco, Cal., and W. W. Middle-coff, of Los Angeles, Cal., for appellees.

Brainard Tolles, of New York City, for complainant trustee.

Before GILBERT and ROSS, Circuit Judges, and WOLVER-TON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). In pursuance of its primary purpose of acquiring a waterworks system, the city of Santa Cruz issued $300,000 of city bonds. It is shown that $30,000 of these bonds, with other funds of the city, the whole amounting to about $40,000, were expended in procuring water rights, rights of way, easements, and a reservoir site, looking to the construction of the water system, and a franchise was granted the

city for laying the mains and constructing the necessary equipment for the completed system.

At this juncture in the progress of the work, the state Legislature passed an act limiting the indebtedness which cities within the state were permitted to incur to 5 per cent. of the assessed valuation of the property within the city. Upon this basis the city of Santa Cruz was limited to an indebtedness of about $162,000. A question arose respecting $270,000 of the $300,000 bond issue, whether these remaining bonds, not having been disposed of by the city by sale and transfer to the purchaser, were affected by the act. It was thought by some at least that they were rendered nugatory, and could not be henceforth regularly sold in the market. Finding itself in this condition, and its credit circumscribed, the city was unable to proceed with the construction of the waterworks system upon the plan contemplated. Being unable to dispose of the remainder of the $300,000 of city bonds, the scheme or plan under which the waterworks system was finally constructed was devised. It is fully delineated by the contracts of September 16 and 23, 1889, entered into by and between the city and Coffin & Stanton, which are set forth in the statement.

The obligations entered into through the stipulations of these two contracts were substantially carried out, on the part of both the city and Coffin & Stanton. The city granted to Coffin & Stanton the franchise for construction, conveyed to the Water Company the water rights and reservoir site specified, purchased the water system when completed, entered into possession thereof, received the revenues derived from its operation, and made provision for payment of the interest on the first-mortgage or water bonds outstanding and for a sinking fund for the redemption of such bonds. Coffin & Stanton constructed the waterworks system in conformity with the agreed specifications, organized the City Water Company, and assigned to it the privileges granted by the city, made the necessary cash advances for the construction of the waterworks, and made the deposit as required of the $270,000 of water bonds to be held in trust to secure a like amount of the city bonds. And the Water Company executed a first mortgage on the properties and franchises to secure an issue of bonds to the amount of $400,000, issued to Coffin & Stanton all of such bonds, commenced and completed the construction of the system within the time specified, and conveyed the completed system to the city subject to the mortgage executed by the Water Company to secure the $400,000 bond issue. The deed from the Water Company to the city contains a provision beyond any stipulated for in the contracts, whereby the city assumed the obligations imposed by the mortgage or deed of trust, and agreed to pay the bonds and perform all such obligations.

By a survey of the contracts of September 16 and 23, 1889, the subsequent treatment thereof and the acts and transactions had with reference thereto by all the parties—the city, Coffin & Stanton, and the Water Company—there is left not a semblance of doubt that the city's aim and purpose was to acquire the waterworks system, and that the scheme devised for the acquirement of the system was in-

tended to circumvent the law limiting the indebtedness of the city to an amount not to exceed 5 per cent. of the assessable valuation of the property within the city. While not assuming the indebtedness incident to the construction of the water system directly, the device was to incumber the property of the city therewith, and thus to accomplish indirectly what it was not allowed to do directly. The questions that arise for consideration grow out of this situation. There is no question of fraud to be determined. The pleadings do not present such a case, and, while some irregularities of the kind are suggested by the argument and upon the briefs of counsel, they are foreign to the real controversy.

[1] By the Constitution of the state of California (section 18, art. 11) it is provided:

"No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose, exceeding in any year the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose, nor unless, before or at the time of incurring such indebtedness, provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty years from the time of contracting the same. Any indebtedness or liability incurred contrary to this provision shall be void."

This is an inhibition against which a municipality cannot incur any indebtedness exceeding in any year the income and revenue provided for it for such year except in a certain mode or manner prescribed. The mode, therefore, becomes the measure of the power of the municipality to incur an indebtedness beyond the measure fixed by the fundamental law. That is to say, before the city can incumber itself with such excess indebtedness, it must have the consent of two-thirds of its qualified electors to that purpose, and, when it has obtained such consent, provision shall be made for collection of an annual tax sufficient to pay the interest on such indebtedness annually, and to create a sinking fund sufficient to discharge the principal within 20 years.

[2] The power to create the excess indebtedness does not abide with the municipality or its common council alone, but with the assent of two-thirds of its electors. It is only when that assent is had that it may proceed. This much for the Constitution of the state.

By statute approved March 4, 1887, specific directions are given as to the manner in which the election shall be held for obtaining the requisite consent of the electors and by which the indebtedness shall be created. Stats. Cal. 1886–1887, p. 13. At the time when the $300,-000 indebtedness was incurred by the issuance of the city bonds for acquiring the waterworks system, there was no limitation to the amount of indebtedness that a city might incur provided it was incurred in the mode pointed out by the Constitution. The city, it is conceded, pursued that mode in issuing these city bonds. By an act of March 19, 1889, this statute was amended so as to require that an ordinance declaring the necessity for incurring the indebtedness should be passed by a two-thirds vote of the legislative branch of the municipality, instead of a three-fourths vote, but in other particulars

there was no substantial change. But it was further enacted by section 5, that:

"No city, town or municipal corporation shall incur an indebtedness for public improvements which shall in the aggregate exceed five per cent. of the assessed value of all the real and personal property of such city, town or municipal corporation." Stats. of Cal. 1889, pp. 399, 400.

It was subsequent to this date that the city of Santa Cruz entered into the contracts under and by virtue of which the bonds in question were issued, these contracts bearing date, respectively, September 16 and 23, 1889. By an act of March 11, 1891, the Legislature amended the above section 5 by substituting the words "fifteen per cent." for the words "five per cent.," thus increasing the amount of indebtedness for which the municipality might lawfully become liable accordingly. Stats. of Cal. 1891, p. 84. The refunding act of March 1, 1893, p. 59, c. 47, amendatory of the act approved March 15, 1883, is as follows, in so far as is necessary to recite:

"Section 1. That section one of the above entitled act is hereby amended to read as follows: '§ 1. That whenever any incorporated city or town, other than cities of the first class in this state, has an outstanding indebtedness, evidenced by bonds and warrants thereof, the common council, board of trustees, or other governing body thereof, shall have power to submit to the qualified electors of such city or town, at an election to be held for that purpose, the question of refunding such indebtedness. Said election shall be called and held in the same manner in which other elections are held in such city or town. The notice of such election shall recite the indebtedness to be refunded, together with the denomination, character, time of payment, rate of interest, as well as all other details of the bonds proposed to be issued. Such bonds shall be of the character known as "serials," one-fortieth of the principal being payable each year, together with interest due on all sums unpaid. Said bonds may be issued in denominations not to exceed one thousand dollars, nor less than one hundred dollars; principal and interest being payable in gold coin or lawful money of the United States, and either at the office of the treasurer of such city or town, or at a designated bank situated in the cities of San Francisco, New York, Boston or Chicago. Interest upon the same shall not exceed six per cent. per annum, and may be payable semi-annually. Said bonds shall be sold in the manner provided by such city council, or governing body, to the highest bidder for not less than their face value, in the same character of money in which they were payable. The proceeds of such sale shall be placed in the treasury to the credit of the funding fund, and shall be applied only for the purpose of refunding the indebtedness for which they have been issued. Said common council, or other governing body, shall, at the time of fixing the general tax levy for each year, and in the same manner for such tax levy provided, levy and collect annually, each year, sufficient money to pay one fortieth part of the principal of such bonds, and also the annual interest upon the portion remaining unpaid.' "

Preliminarily to entering into these contracts, it would seem from the testimony that the city sold to Coffin & Stanton the balance of its $300,000 bond issue, to wit, $270,000 thereof, and in exchange therefor Coffin & Stanton paid to the city $25,000, which went into its treasury, and gave their check or draft to the city for the amount of the par value of the balance or $245,000. This check was very soon returned to Coffin & Stanton, and the bonds retained by them, it would seem, as an advance towards the payment of the consideration for the acquirement of the waterworks system. When, however, the

contracts were entered into provision was made, as a reading of the contracts discloses, whereby $270,000 of the water bonds should be deposited with the trust company to be held in trust to secure a like amount of city bonds, which it is stipulated were theretofore "sold to Coffin & Stanton." Thus it was intended, no doubt, to secure the city against a double payment of $270,000 towards the consideration for the construction of the water system, but the contracts contemplated the issuance and negotiation of both classes of bonds, namely, the city and water bonds. Another provision of the contracts contemplated that there might be changes and additions to the water system which were to be paid for by issuance of a sufficient number of first-mortgage or water bonds at 90 per cent. of their par value to meet the contingency, and also sufficient of such bonds at the same rate to pay the accruing interest of the issue needed for meeting the added expense for these changes and additions to the system. Now, not only the $320,000 of the authorized bond issue of the Water Company were certified and issued to Coffin & Stanton, but also the remaining amount up to the full authorization. Thus there were issued and certified to Coffin & Stanton $130,000 bonds in excess of the $270,000 of the city bonds which the city delivered to them in the preliminary negotiations for the construction of the waterworks system. It is concerning this excess issue that the present suit is being maintained. But of this $130,000 $27,000 were returned to the trustee by Coffin & Stanton, and from the evidence and by stipulation of counsel it appears that others of these bonds were also returned to the trust company, reducing the amount of the outstanding bonds to 88, or in par value $88,000. There is therefore no further controversy as to the amount and class of bonds in litigation. They consist of the first-mortgage bonds of the Water Company, or what we style the water bonds, and not of the city bonds. What has become of all the bonds of both issues save these it is not material to inquire. The Water Company was organized and incorporated some time subsequent to the time when the city entered into the contracts with Coffin & Stanton. The $400,000 bond issue was thereupon authorized, the bonds themselves to bear date May 1, 1890. During the months of June and July, 1890, the entire balance of $130,000 of these bonds, including the $88,000 in suit, was certified and issued and delivered to Coffin & Stanton. It therefore appears that, if these bonds are to be considered as evidentiary of the city's indebtedness, the city had incurred an indebtedness far beyond what it was then permitted by statute to incur.

[3] We may first consider whether this indebtedness should be legitimately accounted an indebtedness of the city. While the city did not agree or undertake primarily to pay the indebtedness, it did agree most positively to take over the waterworks system when completed by deed subject thereto. Further, in order to enable it to secure the construction of the system, the city conveyed property to Coffin & Stanton worth near $40,000, besides granting the necessary franchise for laying the mains, installing hydrants, etc.; so that the city was in part, leaving aside for the present any mention as to the regularity of

the transaction, only coming into its own through the contemplated deed. The city, by taking over the property by deed under such circumstances, subject to the mortgage made to secure the issue of water bonds, would thereby incur an indebtedness within the inhibition of the statute.

In Evans v. Holman, 244 Ill. 596, 91 N. E. 723, the village of Clay City by ordinance granted to one Fisher the right to construct and maintain within the village an electric light plant for a period of 30 years, and agreed to pay Fisher during the time $70 per annum for each of 23 arc lamps. By another ordinance adopted at the same time the village provided for the issuance of village bonds in the amount of $4,200, the limit to which it was permitted to incur an indebtedness. Shortly thereafter it entered into a contract with Fisher for the construction of the plant, Fisher agreeing to incorporate a company which should issue bonds in the sum of $7,296 to be secured by a first mortgage upon the plant, and, when the plant was completed, to convey the same to the village, the village agreeing to pay to Fisher the price of the $4,200 village bonds in cash and to take the deed subject to the mortgage securing the payment of the $7,296 of company bonds. The plant was completed, and the deed made as contemplated, but when the village was about to pay one of the mortgage bonds and accrued interest on such bonds, and the village bonds, it was enjoined by taxpayers. The question was squarely presented whether the village had exceeded its limit of indebtedness by an acceptance of the deed to the plant subject to the company mortgage, and it was held that it had; the court saying:

"The plan was merely a scheme concocted for the purpose of evading the Constitution, and devices for that purpose have never succeeded."

The village was allowed, however, to apply the net income of the plant toward the payment of such mortgage indebtedness.

In Browne v. City of Boston, 179 Mass. 321, 60 N. E. 934, the city of Boston arranged with the owner of a parcel of land to purchase the same in this way, the city to pay $24,000 through the issuance of bonds to the owner, the owner to mortgage the property for $202,000, and when so mortgaged to convey the equity of redemption, or the property subject to the mortgage, to the city. Certain taxpayers sought to restrain the city from completing the purchase on the ground that the city would thereby exceed its debt limit. It was held that the purchase should be enjoined because, in order to keep the lands, the city would be required to pay the mortgages, and hence, in effect, the purchase price was beyond the debt-incurring power. The court reasoned that, while it was true that no action could be maintained against the city for the mortgage deed, yet it was bound to pay it in order to retain the land, otherwise it must lose its equity, so that in practical effect the mortgage would become that of the city. It was further said:

"The object of the statute is to protect the taxpayer by confining the indebtedness of the city within a prescribed limit. The manner in which the indebtedness is created is immaterial, if the result is to subject the city to a present liability, direct or indirect, which the taxpayers eventually will

be called on to meet. It seems to us that such will be the result of the ingenious scheme that has been devised in the present case."

In Fidelity Trust & Guaranty Co. v. Fowler Water Co. (C. C.) 113 Fed. 560, a sale of waterworks was made to the town of Fowler subject to the incumbrance of any bonded indebtedness placed upon the plant by Fowler Water Company, which constructed the plant; it being stipulated that the town did not assume the payment of such indebtedness. The question being presented whether by the transaction the city would exceed its limit of indebtedness, the court, speaking to the subject, says:

"If the town had owned the waterworks free of incumbrance, it could not have executed a valid mortgage upon them. No municipal corporation has any power or authority to incumber its property by mortgage, in the absence of legislative authority so to do. If a municipal corporation should accept a conveyance of property subject to a mortgage, it must pay off the mortgage debt, or lose the property. The purchase of the waterworks by the town of Fowler, subject to the incumbrance created by the deed of trust, would create an indebtedness to the full extent of such incumbrance."

And it was held that the town of Fowler was constitutionally disabled from purchasing the waterworks in that manner.

So of other authorities, the general doctrine being that a purchase of what may be termed the equity in property by a municipality subject to a mortgage or bonded indebtedness is the incurring of a municipal debt to the extent of the incumbrance of such property, because the municipality must pay the incumbrance or lose the property. It is not a debt which the municipality can be forced to pay, but it is one which it purposes to pay, and in that sense is a debt inhibited by statutory limitations upon municipal indebtedness. See Earles v. Wells, 94 Wis. 285, 68 N. W. 964, 59 Am. St. Rep. 886; Brown v. City of Corry, 175 Pa. 528, 34 Atl. 854; Ironwood Water Works Co. v. City of Ironwood, 99 Mich. 454, 58 N. W. 371. Nor does it alter the case or impair the effect of the rule that the indebtedness is to be paid out of receipts or income from the property taken over, or from, or is paid in the way of, an annual tax or rentals. City of Joliet et al. v. Alexander, 194 Ill. 457, 62 N. E. 861; Brown v. City of Corry, supra; Earles v. Wells, supra.

It is next urged on the part of the city that, the agreements under which it acquired the plant being of record and constituting the muniments of title of the Water Company, they imparted constructive notice to the purchasers of the water bonds that the city was proceeding beyond its power in incurring indebtedness by the acquirement of such waterworks in the manner contemplated, and therefore that they were not bona fide purchasers for value of the water bonds.

[4] It is settled law that recitals in municipal bonds to the effect that they are issued in pursuance of and in conformity with statutes and ordinances authorizing their issue operate as an estoppel to the municipality to deny that they were so issued. As was said in Moulton v. City of Evansville (C. C.) 25 Fed. 382, 387:

"A general statement that the bonds have been issued in conformity with the law will suffice, so as to embrace every fact which the officers making the statement are authorized to determine and certify."

A leading case upon the subject is Evansville v. Dennett, 161 U. S. 434, 16 Sup. Ct. 613, 40 L. Ed. 760. This involved the issuance of bonds by a city in payment of subscription to stock in a railroad company. The bonds contained recitals that they were issued in payment of such subscription "made in pursuance of an act of the Legislature of the state of Indiana and ordinances of the city council of said city, passed in pursuance thereof," and the faith, credit, real estate, revenues, and all resources of the city were irrevocably pledged for the payment of principal and interest. It was there contended that, if the ordinances of the city were examined, they would show that the election held by the city upon the question of the issuance of the bonds was not legally held, thus rendering the bonds nugatory. But the court said, after reviewing its former decision:

"As, therefore, the recitals in the bonds import compliance with the city's charter, purchasers for value having no notice of the nonperformance of the conditions precedent were not bound to go behind the statute conferring the power to subscribe, and to ascertain, by an examination of the ordinances and records of the city council, whether those conditions had, in fact, been performed. With such recitals before them they had the right to assume that the circumstances existed which authorized the city to exercise the authority given by the Legislature."

The bonds were therefore sustained in the hands of a purchaser for value.

The doctrine was reaffirmed and applied in the case of Waite v. Santa Cruz, 184 U. S. 302, 22 Sup. Ct. 327, 46 L. Ed. 552, which involved refunding bonds issued with a view to payment of the identical bonds in dispute here. The court there announced its conclusion in the following language:

"When, therefore, the refunding bonds in suit were issued with the recitals therein contained, the city thereby represented that it issued them under and in pursuance of and in conformity with the act of 1893 and the Constitution of the state. As nothing on the face of the bonds suggested that such representations were false; purchasers had the right to assume that they were true, especially in view of the broad recital that everything required by law to be done and performed before executing the bonds had been done and performed by the city. As there was power in the city to issue refunding bonds to be used in discharging its outstanding indebtedness of a specified kind, purchasers were entitled to rely upon the truth of the recitals in the bonds that they were of the class which the act of 1893 authorized to be refunded. They were under no duty to go further and examine the ordinances of the city to ascertain whether the recitals were false. On the contrary, purchasers could assume that the ordinances would disclose nothing in conflict with the recitals in the bonds."

It is unnecessary to pursue the authorities further on this subject, except to cite Presidio County v. Noel-Young Bond Co., 212 U. S. 58, 29 Sup. Ct. 237, 53 L. Ed. 402, where the doctrine is again reaffirmed, citing previous authorities.

[5] On the other hand, if the bonds contain no sufficient recital as to their issuance in conformity with the Constitution, laws, or ordinances, or if the issuance is beyond the power of the municipality to authorize, then it is not estopped to controvert their validity. The doctrine is applicable in cases where bonds have been issued in excess

202 F.—24

of constitutional or legislative authority. Township of East Oakland v. Skinner, 94 U. S. 255, 24 L. Ed. 125; Buchanan v. Litchfield, 102 U. S. 278, 26 L. Ed. 138; School District v. Stone, 106 U. S. 183, 187, 1 Sup. Ct. 84, 27 L. Ed. 90; Dixon County v. Field, 111 U. S. 83, 4 Sup. Ct. 315, 28 L. Ed. 360; Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820, 29 L. Ed. 132; Doon Township v. Cummins, 142 U. S. 366, 12 Sup. Ct. 222, 35 L. Ed. 1044; Nesbitt v. Riverside Independent District, 144 U. S. 610, 12 Sup. Ct. 746, 36 L. Ed. 562; Hedges v. Dixon County, 150 U. S. 182, 14 Sup. Ct. 71, 37 L. Ed. 1044.

The bonds in suit contain no recitation or certification by the municipal or other officers that they were issued in conformity with either the Constitution or laws of the state, or with any ordinance of the city authorizing their issue. Indeed, they are not city bonds at all, but bonds of a private corporation containing no certificate whatever as to the regularity or legality of their issuance. Of course, all holders must have notice that the bonds are not primarily obligations of the city. If, therefore, bonds containing no recital or certification to the effect that they were authorized and issued in pursuance of law and the ordinances of the municipality do not estop the municipality to controvert their validity for want of power to authorize their issuance, the obligations being the bonds of the city itself, by how much stronger reason would the municipality not be estopped to controvert the validity of bonds not of its issuance but secured by mortgage upon the city's property, which mortgage as security the city was without power to authorize or to execute? We think that the city's contention that the plaintiffs are not the owners and holders of these bonds for value and without notice of their infirmity is sound, and that they must be deemed to have taken them with full notice of the want of power in the city to authorize their issuance or to secure the same by mortgage upon its property. But, whether this be so or not, in the view we take of the case, this question relating to the bona fides as it respects the purchase and ownership of these bonds by the present holders becomes practically immaterial.

The appellant's counsel claim, in effect, that the city had no power to accept the deed, and thereby to assume and to obligate itself to discharge the indebtedness evidenced by the bonds and secured by the mortgage of the Water Company. In other words, the question is presented whether the city was eventually authorized and empowered to incur the indebtedness which it attempted to assume, and thus obligate itself to pay to the holders of the bonds. We have seen that the mode prescribed for incurring indebtedness is also the measure of the municipality's power for so doing. But counsel for appellees strenuously urge that, although the acts of the city in assuming the indebtedness may have been ultra vires, they were not ultra vires in a sense that rendered the transactions absolutely and unalterably void, but that where the contract has been fully executed, the city having received the benefit, it will not be permitted to disavow or abrogate its liability. Let us examine the authorities on the subject. It is said in St. Louis Railroad v. Terre Haute Railroad, 145 U. S. 393, 407, 12 Sup. Ct. 953, 957 (36 L. Ed. 748):

"If the contract is illegal, affirmative relief against it will not be granted, at law or in equity, unless the contract remains executory, or unless the parties are considered not in equal fault, as where the law violated is intended for the coercion of the one party and the protection of the other, or where there has been fraud or oppression on the part of the defendant."

And further:

"When the parties are in pari delicto, and the contract has been fully executed on the part of the plaintiff, by the conveyance of property, or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract."

The case was one where the plaintiff railroad company entered into a contract with the defendant railroad company, the defendant company not possessing the power so to contract, and as to it the act of so contracting was ultra vires its authority. The plaintiff, after the contract had been fully executed and it had received rents from the defendant for seventeen years, sought to abrogate the lease, but the court refused upon such a state of facts to grant the relief, assigning as a further reason therefor that plaintiff had been guilty of laches. The rule is very well stated in Long v. Georgia Pac. Ry. Co., 91 Ala. 519, 8 South. 706, 24 Am. St. Rep. 931:

"It is thoroughly well-settled law that a party to an ultra vires executory contract, made with a corporation, is not estopped to set up the want of corporate capacity in the premises either by the fact of contracting, whereby the power to contract is in a sense admitted or recognized, or by the fact that the fruits or issues of the contract have been received and enjoyed; and this, though the assault upon the transaction come from the corporation itself. But where the contract is fully executed, where whatever was contracted to be done on either hand has been done, a different rule prevails. In such case the law will not interfere, at the instance of either party, to undo that which it was originally unlawful to do, and to the doing of which, so long as the contract to that end remained executory, neither party could have coerced the other."

This is a case where a party sought to recover land that he had sold to a corporation having no power to purchase, and it was held that he could not recover. See, also, Miners' Ditch Co. v. Zellerbach, 37 Cal. 543, 99 Am. Dec. 300; Parish v. Wheeler, 22 N. Y. 494, 508; Lestapies v. Ingraham, 5 Pa. 71, 81.

[6] The principle applies not as an estoppel to the corporation, where the ultra vires contract is still executory, to set up its incapacity to entertain it; but where the contract has been executed—that is, fully and completely performed on both sides—the court will not interpose to restore either party his former estate, or grant other relief, but will leave the parties where it found them. But, however well-established this rule may be, relief will nevertheless be granted if it can be done independently of the contract, or a new, further and independent consideration subsists in support of the transaction sought to be enforced. Mr. Justice Miller recognizes the principle in part in an opinion rendered in Penn. Co. v. St. Louis, Alton, etc., Railroad,

118 U. S. 290, 317, 6 Sup. Ct. 1094, 1106 (30 L. Ed. 83). In a discussion of the general rule attending ultra vires contracts, he says:

"But we understand the rule in such cases to stand upon the broad ground that the contract itself is void, and that neither what has been done under it, nor the action of the court, can infuse any vitality into it. Looking at the case as one where the parties have so far acted under such a contract that they cannot be restored to their original condition, the court inquires if relief can be given independently of the contract, or whether it will refuse to interfere as the matter stands."

But in a much earlier case the doctrine is affirmed that though an illegal contract will not be enforced by the courts, yet where such a contract has been executed by the parties themselves, and the illegal object has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise express or implied and the transaction will not be unraveled for the ascertainment of its origin. Planters' Bank v. Union Bank, 16 Wall. 483, 21 L. Ed. 473. See, also, Lestapies v. Ingraham, supra.

And it is again affirmed by the Supreme Court that:

"An obligation will be enforced, though indirectly connected with an illegal transaction, if it is supported by an independent consideration, so that the plaintiff does not require the aid of the illegal transaction to make out his case." Armstrong v. American Exchange Bank, 133 U. S. 433, 469, 10 Sup. Ct. 450, 461 (33 L. Ed. 747).

These principles find application in Illinois Trust & Savings Bank v. Pacific Ry. Co., 117 Cal. 332, 342, 49 Pac. 197, 200, a California case of some analogy to the one at bar. In this case the question was made that the Pacific Railway Company had exceeded its power in mortgaging certain property that it had acquired from another company, namely, the Cable Railway Company, and hence was not liable under a foreclosure of the bonds thus secured. The court disposes of the contention as follows:

"But it is said that the bonds themselves were issued in contravention of law, and are void in the hands of the holders. This is asserted, as we understand appellant's contention, because of the connection between the issue of bonds and the attempted acquisition by the Pacific Railway Company of the property and franchises of the Cable Railway Company on which it was supposed, when the bonds were authorized, that they would be secured. The argument necessarily assumes, though it is not precisely so stated, that whoever bought a bond thereby promoted an illegal enterprise, and must lose his money. We dissent from this view. Granting that it was ultra vires of the Pacific Railway Company to mortgage the property of the Cable Railway Company, it was still intra vires for it to borrow money and issue evidences of indebtedness. This is not denied. Consequently its bonds were not invalidated by the want of power to make the mortgage by which they were in terms secured. Railroad Co. v. Lewis, 33 Pa. 33 [75 Am. Dec. 574]. If, then, there was any taint of illegality in the sale or pledge of the bonds, it must have lain in the purpose to which the proceeds were designed by the Pacific Railway Company, paying the debts of the Cable Railway Company, completing and extending its scheme of street transit. There was nothing criminal or against good morals in the effort of the Pacific Railway Company to acquire the entire plant and franchises of the Cable Railway Company. At the most, it was an attempt at something beyond the charter powers of the companies, and forbidden by considerations of public policy; but that was a vice which infected only the contract of the two corporations. The issue and disposition of bonds to third persons consti-

tuted a series of transactions each resting on a new consideration, and connected only indirectly with the contract between the corporations. Admitting, as urged by appellant, that the holders had notice of the purposes of the Pacific Railway Company, yet they did nothing to promote those purposes beyond parting with their property on the faith of its obligations. They do not found their right of recovery on the illegal contract between the companies; and, in our opinion, they are not affected by it."

[7] We are convinced that the acts of the city of Santá Cruz in entering into its contractual relations with Coffin & Stanton were not ultra vires in its primary sense. It was acting in its proprietary or quasi private relation, and not in its governmental capacity, by which it exercised the sovereign powers with which it was endowed. If, therefore, it subsequently had power to incur the indebtedness attending the construction and acquirement of the waterworks system, it had power to assume the obligations of the Water Company.

[8] It seems to be the rule in California that a person purchasing subject to a mortgage and agreeing to pay the mortgage liability will not be heard to question the validity of such liability, and by thus assuming payment he becomes primarily liable to the holders of the obligations thus assumed. Johns v. Wilson, 180 U. S. 440, 21 Sup. Ct. 445, 45 L. Ed. 613, citing Williams v. Naftzger, 103 Cal. 438, 37 Pac. 411. See, also, Alvord v. Spring Valley Gold Co., 106 Cal. 547, 40 Pac. 27; Weaver v. McKay, 108 Cal. 546, 41 Pac. 450.

[9] This brings us to a consideration of the effect of the submission to the electors of the city of the propriety of refunding certain bonded indebtedness, including indebtedness of the Water Company, comprising the bonds in suit. The submission was made by Ordinance No. 314 passed by the city council and approved by the mayor February 26, 1894, directing the election to be held on March 13, 1894. That the election was accordingly held, resulting favorably to the refunding of such bonded indebtedness, is attested by Ordinance No. 317 passed and approved March 15, 1894. The question thus submitted to the qualified electors was that of "refunding the bonded indebtedness of said city and issuing bonds therefor, and providing for the payment of the same." The ordinance (No. 314) further declares that the indebtedness of the city which it is proposed to refund is as follows:

" * * * (2) Eighty-nine (89) first-mortgage bonds (with interest thereon from November 1st, 1893) of the corporation, the City Water Company of Santa Cruz, heretofore issued by said corporation, * * * secured by a mortgage or deed of trust upon the property known as the City Waterworks of Santa Cruz * * * and which said bonds outstanding were, at the time of the conveyance by the City Water Company of Santa Cruz to the city of Santa Cruz of the property known as the City Waterworks, and now are, a valid lien and charge upon said property known as the City Waterworks, and became thereby a part of the bonded indebtedness of the city of Santa Cruz."

We are advised by the resolution of the common council of the city of Santa Cruz adopted November 24, 1890, that the waterworks system had been "completed according to contract, and, the property having been tendered by the contractors," the city attorney was directed to examine all deeds of conveyance, etc., and, if found regular,

to place the same of record. Much later, to wit, May 2, 1892, we find that the matter of the acceptance of the deed of the city waterworks to the city of Santa Cruz was ordered referred to the new council. Later, on May 23, 1892, the deed from the City Water Company was referred to the water committee. Thus the matter seems to have rested until March 5, 1894, when the city council by motion ordered that the deed be accepted and recorded. This action of the common council was not approved by the mayor, however, until April 2, 1894.

It is manifest that the election for submitting the refunding project to the electors was not held for the purpose of authorizing the city to incur the indebtedness arising in course of the construction and acquirement of the waterworks system, but, by the very terms of the ordinance submitting the question, of refunding the bonded indebtedness of the city and issuing bonds for the purpose, and by the plainest language possible the electors sanctioned such indebtedness in so far as the bonds in question are concerned, and thereby, in effect, ratified the action of the city in incurring the same. The vote was in reality upon the question whether the city should pay this indebtedness through a refunding of the same, and it was in effect declared that it should. There could scarcely be a more positive ratification of the acts of the city in incurring the indebtedness, assuming that such indebtedness was in reality that of the city, though incurred beyond its legal authority. It will be noted that the city delayed for a long while, more than three years, the acceptance of the deed from the Waterworks Company, after the completion of the water system. Why the delay does not fully appear from the record. But it does appear that the deed which was accepted contains an agreement on the part of the city to assume and pay the indebtedness of the Water Company, which was wholly, as we have seen, beyond any stipulation contained in the original contract between the city and Coffin & Stanton. It may be fairly inferred from this circumstance, and the fact and manner of submitting the refunding project to the electors for their authorization and ratification, that the city had been led to doubt its authority to acquire the waterworks in the manner formerly adopted and to incur the indebtedness necessary to its construction, and was seeking a ratification of its acts and an authorization by the electors for assuming the indebtedness previously incurred by acceptance of such deed with the covenant or agreement noted. Resort was had to the plan of refunding the bonded indebtedness, treating the water bonds in question as a part of such indebtedness. Concurrent in time with procuring authority for refunding, the city accepted the deed, with the undertaking on its part to pay such bonded indebtedness of the Water Company. It would thus seem that the two acts were a part of the same plan, although it was designed that the bonded indebtedness, the water bonds, should be paid through the issuance of bonds of the city and with the proceeds thereof.

It will be noted that the resolution for the acceptance of the deed was adopted March 5, 1894, but it was not approved by the mayor until April 2d, and, of course, did not become operative until the latter

date, and cannot be said to have been in reality passed before that date. So that we have an acceptance of the deed with the agreement on the part of the city to assume and pay the water bonds at the time or subsequent to the time when the city was authorized by the electors through an election regularly held to refund the bonded indebtedness, including the water bonds in question. As we have indicated, this elec-. tion was tantamount to a recognition and ratification of the water bonds as bonded indebtedness of the city, and, in effect, authorized the city to incur such indebtedness, granting that it never had previous authority to do so. This the city attempted to do by assuming and agreeing to pay such indebtedness in process of its acceptance of the Water Company's deed.

It may be suggested that the authorization to incur the indebtedness was not in the mode pointed out by the Constitution of the state of California and the statute. To this it may be answered that the mode was at least substantially followed. There was an election by the electors of the city pertaining to the refunding of certain indebtedness, which it was assumed that the city was obligated to pay, or at least ought to pay, and it was declared that such indebtedness should be paid through a refunding of the same. The case of Bell v. Waynesboro, 195 Pa. 299, 45 Atl. 930, lends support to this view. It was said in the decision of the court: "In the present case we hold that the vote of the 7th November, 1899, authorizing the town council to create the indebtedness for the express purpose of liquidating this floating debt, which had been irregularly contracted, was such a recognition and ratification of the debt as made it enforceable against the borough. It made valid that which was before illegal." In that case, as in this, the city authorities had incurred an indebtedness beyond the authority of the borough to incur without the assent of the electors. But the electors could and did ratify the indebtedness thus illegally incurred by authorizing the town council to create an indebtedness for the purpose of liquidating this excess indebtedness.

Now we come to the question whether the city could lawfully undertake and agree to pay this bonded indebtedness of the Water Company in view of its ultra vires agreement with Coffin & Stanton, whereby it sought to acquire the waterworks system in the first place. The agreement to assume the remaining indebtedness of the Water Company was a new and independent contract. The agreement under the Coffin & Stanton contract was simply that the city should take the deed subject to the mortgage securing such water bonds, so that the agreement to assume the mortgage indebtedness is beyond anything contained in that contract, whatever may have been the effect of accepting the deed under the original stipulation. True, the consideration for the enlarged agreement was the acquirement of the water system. But the original contract has been fully executed, and, as was said in Planters' Bank v. Union Bank, supra:

"The money or thing which was the price of it may be a legal consideration between the parties for a promise, express or implied, and the court will not unravel the transaction to discover its origin."

Further, as was said in Illinois Trust & Savings Bank v. Pacific Ry. Co., supra:

"The issue and disposition of bonds [in this case the water bonds] to third persons constituted a series of transactions each resting on a new consideration, and connected only indirectly with the contract between the corporations [here the city and Coffin & Stanton]."

Also within the principle of that case, as previously observed, the attempt of the city to acquire the water system as contemplated was a transaction within the exercise of its proprietary functions, a thing inhibited by considerations of public policy, and not because it was criminal or contrary to good morals. It was a thing, therefore, that it might with just propriety ratify or confirm; the statutory inhibition being removed. The inhibition was so removed in the present case in so far as it concerned an incurring of indebtedness equal to and beyond the amount of these outstanding water bonds, and, it having been authorized thereto by the action of the electors, we are of the opinion that the city lawfully assumed the payment of such indebtedness. The Supreme Court of the United States has recognized the force of this view in Waite v. Santa Cruz, 184 U. S. 302, 313, 22 Sup. Ct. 327, 331 (46 L. Ed. 552). It says:

"One of the contentions of the city is that the words 'outstanding indebtedness, evidenced by bonds and warrants thereof,' in this act do not embrace the 89 bonds executed by the Water Company. Those bonds, although not executed by the city, certainly constituted a part of its outstanding indebtedness, for the reason that the city had assumed to pay them. Both the city authorities and the qualified electors so regarded the matter. The city's assumption of the bonds imposed as much obligation upon it to pay them as if it had itself directly executed and issued them. It could not acquire complete ownership of the waterworks without paying for them, and it took a deed for the waterworks expressly subject to a valid lien in favor of the Water Company's first-mortgage bonds, including the above 89 bonds. In every substantial sense, therefore, these bonds were part of the city's outstanding bonded indebtedness. Such is the argument made in behalf of the plaintiff, and its force is recognized."

It is not a question now whether the water bonds were such, evidenced by the city's bonds and warrants, as are authorized for refunding under the act of March 1, 1893, but whether the city has through its electors recognized the outstanding water bonds as evidentiary of indebtedness of the city, and thereby in effect authorized the city to assume and pay such indebtedness. We think it has. From an equitable point of view the city has acquired this water system and has had the use of it for many years, and it ought not to be heard, after the inhibition for incurring the indebtedness has been removed and the electors have taken action recognizing the indebtedness here in suit, and in effect ratifying the acts of the city in incurring such indebtedness, to deny its obligation to pay the same under its assumption thereof through acceptance of the deed of the Water Company to the water system.

It is finally urged that the decree of foreclosure as rendered is faulty, in that it does not preserve to the city the statutory right of redemption from sale as directed to be made. From an examination of the

decree it will appear that no order or adjudication has been made touching redemption from sale, but, on the other hand, the court has reserved for further determination all matters of equity "not herein expressly adjudged, and any party to this cause may apply for further order and direction touching the matters in issue undisposed of by this decree." If the city is entitled to the right of redemption, the trial court under this reservation has ample authority to grant it, should it be deemed necessary, in view of the present form of the decree, to do so.

The decree of the trial court will be affirmed, with costs to appellees

ROSS, Circuit Judge. I concur in the judgment in this case, because the Supreme Court in the case of Waite v. Santa Cruz, 184 U. S. 302, 314, 22 Sup. Ct. 327, 46 L. Ed. 552, held that the city's assumption of the bonds that had been issued by the Water Company (88 of which are in suit here) imposed as much obligation upon the city to pay them as if it had itself directly executed and issued them, and because it appears in the present case that at the time the city thus assumed the payment of the bonds issued by the Water Company the indebtedness the city was authorized to incur had been so extended by a statute of the state as not to bring its action in assuming the indebtedness evidenced by the water bonds within the inhibition of any provision of the Constitution or statutes of the state.